IN THE

TENTH COURT OF APPEALS




 
 
 
 
 
 
 


 



No. 10-04-00252-CV

 

Del Lago Partners, Inc. AND Del Lago 

Partners, L.P. dOING BUSINESS UNDER 

THE ASSUMED NAME Del Lago Golf 

Resort & Conference
 Center, and BMC – 

The Benchmark Management Company,

                                                                                    Appellants

 v.

 

BRADLEY SMITH,

                                                                                    Appellees

 

 



From the 359th
District Court

Montgomery County, Texas

Trial Court No. 01-09-05938 CV

 



O p i n i o n



 

Bradley Smith was severely injured in a
bar fight at Del Lago, a resort.[1] 
He brought a premises liability action against Del Lago, and a jury found the
resort 51% responsible and Smith 49% responsible for the occurrence.  The jury
found actual damages in the amount of $2,874,000, and the trial court, after
reducing the damages amount by 49% and then adding prejudgment interest, entered
judgment for Smith in the amount of $1,478,283.  Del Lago appeals.  We will
affirm.

Background

Del Lago, a 300-acre resort on the
shores of Lake Conroe, consists of a conference center, a separate 21-story
tower with 310 hotel rooms, and 58 golf course cottages.  Permanent residences,
a marina, a beach area, and a golf course are also on site.  The conference
center holds the central lobby, banquet rooms, a gift shop, and the Grandstand Bar. 
The bar seats 208 persons inside and 200 on the outside deck.

Del Lago’s security force included two
off-duty, experienced law enforcement officers, John Chancellor (Chief of the
Shenandoah Police Department) and Lanny Moriarty (a lieutenant with the
Montgomery County Sheriff’s Department).  As of June 2001, Chancellor had been
working at Del Lago for six years, and Moriarty had been working there for
eight years.  Ruben Sanchez, a retired 20-year fireman and paramedic, became a
Del Lago loss-prevention officer in 2000, and at the time of trial, he was Del
Lago’s Director of Security and Safety.  Del Lago’s security force maintained
order and security throughout the resort.  Rather than staying in one place, Chancellor
and Moriarty would patrol the entire resort together (to “make a presence” and
for officer safety) using a golf cart but would split up to walk through the conference
center.

Smith, a 29-year-old project manager
for Deloitte Consulting, attended a weekend Sigma Chi fraternity 40th reunion
at Del Lago from Friday to Sunday, June 8-10, 2001.  On Friday night, Smith and
his fraternity brothers attended a Sigma Chi event in the bar.  Smith estimated
that his group was in the bar for three hours; they stayed until it closed.  Smith
and Spencer Forsythe, a fraternity brother, testified that a uniformed security
officer was on duty in the bar “for hours” that evening.  The officer even ejected
an intoxicated fraternity brother who had become loud and unruly, and he made
everyone leave at midnight, even though usual closing time was 1:00 a.m.

On Saturday evening, Sigma Chi had a
reception and dinner in a Del Lago banquet room just across from the bar; 228 persons
attended.  Around 9:00 p.m., Smith and a group of fraternity brothers left the
banquet room and went to the bar, which was described as “packed” and “standing
room only” at that time.  The bar staff was very busy.  Forsythe estimated the
crowd was 150 to 200 people, about double what it had been the night before. 
Around midnight, about fifteen to twenty persons from a wedding party made a
loud, noticeable entrance into the bar.  Smith and about forty fraternity
brothers were still there.  A fraternity brother “hit on” a female companion of
a wedding party member, and a verbal altercation ensued between the two men. 
Smith said that the men were standing very close to each other, angrily yelling
and pointing for three to five minutes.  Elizabeth Sweet, a bar waitress
working that night (but not employed by Del Lago at the time of trial),
remembered talking with another waitress about the men’s exchanges as a funny
or harmless situation between intoxicated men; they joked that the men “were
drunk and, you know, being just stupid, drunken men.”

Forsythe said that verbal exchanges continued
in the bar for an hour.  He characterized them as “cussing, name-calling,
verbal threats, and hand gestures”; the tension was obvious and everyone could
tell that a serious problem was brewing.  Fraternity brother Toby Morgan also
said that tension was in the air and was growing.  Fraternity brother Cesar Lopez
testified that the conflict between the two groups could be seen for an hour
and a half, “and if you didn’t see it, you were either blind, deaf, or didn’t
care.”  Fraternity brother Michael Brooks, who had experience working in bars,
said that the bar staff should have seen and heard the problems and should have
called security based on the atmosphere.  Forsythe was concerned that the
problems would develop into a fight; Morgan was also concerned.  Brooks said the
ongoing heckling was such that a fight would likely happen and he wasn’t
surprised when the fight broke out.

Del Lago’s procedures called for “zero
tolerance” toward violent acts and threats of violence.  Sweet agreed that the verbal
confrontations between the two intoxicated groups were “heated” and continued “off
and on” for an hour and a half.[2] 
Sweet did not report the situation to the bartender or a manager; she said she did
not see a need to call security.  She had not received any training at Del Lago
on how and when to contact security or how to handle intoxicated patrons,
abusive patrons, fighting patrons, or an unruly crowd.  The bar manager was not
there; Sweet said he had left early that night.  No Del Lago employee intervened
to defuse the situation.  On the other hand, Arlene Duncan, a bartender on duty
that night, testified there had been no confrontations and she had not
witnessed any heated or threatening arguments.  She also said that several
“regulars” were in the bar that night and none had commented about seeing
threatening conduct.

Witnesses testified that the verbal
confrontations turned into physical shoving and pushing altercations,
including:  (1) a loud confrontation and pushing incident that occurred in
plain view of the bartender, about an hour before the big fight; (2) members of
each group “squaring up”; (3) a wedding party member who was pushing fraternity
brothers from behind with his arm “cocked back” and was pulled away by his
group; and (4) a 45-second “shoving match” or “push fight” (as described by
Morgan and occurring ten to twenty minutes before the big fight) that was between
four men, that others in the bar saw and paid attention to, and that was in the
bartender’s view.

Around 1:30 a.m., serving had stopped, the wait staff was picking up drinks, and the patrons were told it was closing
time and they had to leave the bar.  But because no one was leaving, the staff
had to work their way from the back of the bar, moving table to table and
asking the patrons to leave their drinks and to continue their conversations in
the lobby or on the bar deck.  In spite of the difficulty getting the crowd to
leave, the bar staff did not notify security that the bar was closing or of
this difficulty.  As the remaining bar patrons—including the fraternity group
and the wedding party—were being “herded” out of the bar, another verbal
confrontation erupted between a fraternity brother and a wedding party member
at the bar’s double door.  The two sides “bunched up” against each other, with
shoving, jabbing, and arguing going back and forth.  Forsythe noticed that
several of his friends were involved, so he moved toward the two groups, which
totaled about forty persons, to see what was going on.  Punches were suddenly thrown
between the two groups, and Forsythe was pushed against a wall and shoved to the
floor.  Smith, who had not been involved in any of the earlier verbal and
physical confrontations, saw Forsythe being kicked and entered the melee to
pick up Forsythe, whom Smith knew to have heart disease and to be in poor
health.  Smith was hit on the back and on the head as he entered into the
fighting groups, and as he and Forsythe were moving out with the flow of people,
someone put Smith in a headlock.  Smith and his assailant went across the floor
with their and the crowd’s momentum, and Smith’s face hit the wall.

When she saw punches being thrown,
waitress Sweet tried to call security but no number was posted, so she called
the front desk and was told to call security herself.  After getting the number,
she turned the task over to a bartender.  Sweet said that Duncan, the
bartender, tried to stop the fight by yelling at the men to leave, and other
bartenders and waitresses also tried to stop it.  The fight continued out in
the hall, but when a woman caught up in the fight slipped and fell, it ended.  There
were varying estimates of how long the fight lasted:  Forsythe said three to
five minutes; Morgan said a minute and a half to two minutes; Lopez said five
or six minutes; and Duncan said no more than ten seconds.  Sweet said it was
not a quick fight.

Del Lago security logged a
fight-in-progress dispatch at 1:24 a.m.  Sanchez said that he arrived on the
scene within fifteen to twenty seconds of the dispatch, but the fighting was
over when he got there and most of those involved had fled.  Sanchez had been patrolling
the hallway behind the conference center when he got a radio call from the
dispatcher.  Chancellor and Moriarty, who were at the cottages on routine
patrol—they had not been dispatched to the cottage area—arrived within two to
three minutes of the dispatch.  No one wanted to report what had happened or to
give their names, but Smith did tell Sanchez, whom he knew personally, there
had been a fight.  Smith and his friends left the conference center and went to
their respective rooms.[3]

On the night in question, Chancellor and
Moriarty were on duty as security in their law enforcement uniforms, and
Sanchez was on duty as the loss-prevention and security officer.  Chancellor
had determined that, based on Del Lago’s activity that weekend, only two
security officers were needed.  Unlike the night before, no security officer
was stationed in the bar,[4]
but they all said they routinely patrolled it.  Del Lago had no policy
requiring a security officer be stationed in the bar, no matter how large the crowd,
nor was there a policy that a security officer be present at the bar’s closing
time.  Moriarty usually walked through the bar four or five times a night
during his shift, but he could not remember how many times or at what times he
went through the bar that night.  Chancellor said he routinely makes five to
eight rounds through the bar when he is on duty, but he could not recall how
many times he went through that night.  Sanchez walked through several times,
but he too could not remember at what times.  Chancellor and Moriarty neither
saw nor were made aware of any verbal or physical confrontations in the bar,
and the bar staff had not called security to report any problems.  Moriarty
said there is a “crow’s nest”—a loft above the bar—that the officers used to
observe the bar without patrons knowing they are being watched.

Smith, Lopez, and Morgan said they saw
no uniformed officers or Del Lago security personnel in the bar that night at
all.  Forsythe said he saw no security during the hour or so of confrontations
before the fight.  Sweet saw security coming through the bar periodically that
night, but not during the hour and a half of verbal confrontations; she
admitted that security could have come through in that time frame and she maybe
did not see them because she was busy working.  She said that if security had
come through the bar during the verbal confrontations, they should have been
able to notice the problem.

Issues

Asserting nine issues, Del Lago
contends that the trial court erred in denying its motion for directed verdict,
motion for JNOV, and motion for new trial.  Issues one, two, and three assert that
Del Lago owed no duty to Smith.  In issue four, Del Lago claims that the
evidence is legally or factually insufficient to support the finding that Del
Lago breached the alleged duty.

Issues five and six allege that there
is no evidence of proximate cause.  The seventh issue asserts that the evidence
is legally and factually insufficient to support the jury’s negligence finding
and the jury’s 51%/49% apportionment of responsibility.  Issue eight alleges
charge error.  Del Lago’s ninth issue asserts globally that, as to the previous
eight issues, the trial court erred in denying Del Lago’s motions for directed
verdict, for JNOV, and for new trial.

Duty

To prevail on a negligence
cause of action, a plaintiff must establish the existence of a duty, a breach
of that duty, and damages proximately caused by the breach.  Western
Investments, Inc. v. Urena, 162 S.W.3d 547, 550 (Tex. 2005) (citing Doe v.
Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 477 (Tex. 1995)). 
Premises liability is a special form of negligence where the duty owed to the
plaintiff depends upon the status of the plaintiff at the time the incident
occurred.  Urena, 162 S.W.3d at 547.  In the case of an invitee, the
premises liability inquiry focuses on whether the defendant proximately caused the
plaintiff’s injuries by failing to use ordinary care to reduce or eliminate an
unreasonable risk of harm created by a premises condition that it knew about or
should have known about.  Id. (citing Timberwalk Apartments,
Partners, Inc. v. Cain, 972 S.W.2d 749, 753 (Tex. 1998)).  A person generally
has no legal duty to protect another from the criminal act of a third person.  Timberwalk,
972 S.W.2d at 756.  But one who controls the security and safety of the premises
has a duty to use ordinary care to protect an invitee from a third person’s
criminal act if he knows or has reason to know of an unreasonable and
foreseeable risk of harm to the invitee.  Id.  This duty developed out
of the premise that the party with the “power of control or expulsion” is in
the best position to protect against the harm.  Exxon Corp. v. Tidwell,
867 S.W.2d 19, 21 (Tex. 1993).  

Del Lago’s first three
issues assert that it owed Smith no duty.  Whether a duty exists is a question
of law.  Timberwalk, 972 S.W.2d at 756.

Foreseeability requires
only that the general danger be foreseeable, not the exact sequence of events
that produced the harm.  Id.  When the general danger is the risk of
injury from criminal activity, the evidence must reveal specific previous
crimes on or near the premises to establish foreseeability.  Id.  A duty
exists only when the risk of criminal conduct is so great that it is both
unreasonable and foreseeable.  Id.  Whether the risk was foreseeable
must not be determined in hindsight, but in light of what the premises owner
knew or should have known before the criminal act occurred.  Id. at
757.  Factors to be considered in determining foreseeability of the occurrence
of certain criminal conduct are:  (1) whether any criminal conduct previously
occurred on or near the property; (2) how recently the criminal conduct
occurred; (3) how often criminal conduct occurred; (4) how similar the conduct
was to the conduct on the property; and (5) what publicity was given to the
occurrences to indicate that the premises owner knew or should have known about
them.  Id.

For a premises owner to
foresee criminal conduct on property, there must be evidence that other crimes
have occurred on the property or in its immediate vicinity.  Id.  Foreseeability
also depends on how recently and how often criminal conduct has occurred in the
past.  Id. at 757-58.  The occurrence of a significant number of crimes
within a short time period strengthens the claim that the particular crime at
issue was foreseeable.  Id. at 758.  On the other hand, the complete
absence of previous crimes, or the occurrence of a few crimes over an extended
time period, negates foreseeability.  Id.

The previous crimes must be
sufficiently similar to the crime in question as to place the premises owner on
notice of the specific danger, but they need not be identical.  Id.  The publicity surrounding the previous crimes helps determine whether a premises
owner knew or should have known of a foreseeable danger.  Id.  Actual knowledge
or notice of past incidents strengthens the claim that future crime was
foreseeable.  Id.  But unreported criminal activity on the premises is
no evidence of foreseeability.  Id. at 758-59.

 The Timberwalk
factors—proximity, recency, frequency, similarity, and publicity—must be
considered together in determining whether criminal conduct was foreseeable.  Id. at 759.  General foreseeability principles also apply to limit the scope of a
premises owner’s duty in a particular case.  Mellon Mortg. Co. v. Holder,
5 S.W.3d 654, 655, 659 (Tex. 1999) (applying proximate cause’s foreseeability
standard to duty analysis); accord Garcia v. Fifth Club, Inc., 2005 WL 240425,
at *4 (Tex. App.—Austin Feb. 3, 2005, pet. denied) (mem. op.).  Stated broadly,
we determine both the foreseeability of the general danger and the
foreseeability that the injured party—or one similarly situated—would be harmed
by that danger.  Mellon, 5 S.W.3d at 655.

We now review the evidence
presented in light of the Timberwalk factors to determine whether Del
Lago owed Smith a legal duty to protect him from third-party criminal acts on
its property.

The Evidence

Smith, through his security
expert Gerald Brandt, tendered evidence of the following fourteen documented
alleged assaultive crimes at Del Lago for the three and one-half years before
the fight in question:


 January 1, 1999:  Assault at the cottages where
 the 18-year-old suspect was highly intoxicated at a New Year’s Eve party;
 a fight took place between two young women.  Report prepared by Montgomery
 County Sheriff’s Department.


 


 August 29, 1999:  Assault at the bar; a highly
 intoxicated patron became belligerent and combative, starting fights with
 other patrons and ultimately assaulting a police officer around midnight.  Duncan, the bartender, allegedly refused to cooperate, indicating she did not
 want to be involved. Report prepared by Montgomery County Sheriff’s
 Department.


 


 July 23, 2000:  Assault just outside the bar at 2:15 a.m. involving a husband and wife, with alcohol a factor.  Officer Moriarty was
 involved in the investigation.  Report prepared by Montgomery County
 Sheriff’s Department.


 


 June 26, 1999:  Sexual assault at Del Lago at 3:00 a.m.  Report prepared by Montgomery County Sheriff’s Department.


 


 November 4, 2000:  Sexual assault at Del Lago at 2:00 a.m.  Report prepared by Montgomery County Sheriff’s Department.


 


 July 5, 1999:  Sexual assault
 involving a highly intoxicated victim who had been seen by Officer
 Moriarty in front of the conference center in the hours before the rape. 
 Report prepared by Montgomery County Sheriff’s Department. 


 


 July 5, 1999:  Sexual assault.  Alcohol apparently involved;
 empty bottles of beer and whisky were found at the crime scene.  Report
 prepared by Montgomery County Sheriff’s Department.


 


 November 16, 1997:  Assault against a woman by a
 man near the restroom just outside the bar.  The woman had struck the man
 twice in the face in the bar around 1:45 a.m.  The participants were
 described as obnoxious and aggressive.  Officer Moriarty handled the
 incident, and a Del Lago incident report was prepared.


 


 September 20, 1998:  Fight involving a large group
 of hostile men near the rear door of the bar.  Officer Moriarty handled
 the incident, and a Del Lago incident report was prepared.


 


 August 13, 2000:  Two separate assault incidents behind
 the tower.  When the security officer first arrived, a verbal
 confrontation between eight to ten people was ongoing.  Officer Chancellor
 initially sent the participants to their rooms at 2:30 a.m. but was called out again at 3:20 a.m. because the fight was continuing.  A Del Lago incident
 report was prepared.


 


  October 26, 2000:  Fight in the bar between two patrons; one man was intoxicated and unruly, and the officer
 recommended he be barred from the bar.  A Del Lago incident report was
 prepared.


 


 May 20, 2001:  Two separate assault incidents on the golf course
 in the early afternoon.  Del Lago’s officers were called to the scene;
 they were called back fifty minutes later when the fight started again.  A
 Del Lago incident report was prepared.


 

Brandt testified that these
incidents made the bar fight in which Smith was injured foreseeable.  We agree,
yet Smith points to more evidence on the duty issue.  In addition to the above
reported and documented criminal activity, Smith elicited evidence of numerous
occasions of undocumented criminal activity that Del Lago had actual notice of.[5]  Despite Del Lago’s requirement that
all incidents be reported in an incident report, Officer Chancellor admitted it
was obvious that reports are not prepared for all incidents at Del Lago.  While
at one point he said he was not aware of unreported violent crime at Del Lago, Chancellor
agreed that there had been numerous altercations at Del Lago before Smith’s
injury; he said he had gone to the bar more than twenty-five times and to the
cottages and the tower approximately twenty-five times for verbal and physical confrontations
(arguments and fights) between guests in his six years at Del Lago.  Chancellor
had never witnessed a fight in the bar, but he agreed that his presence in
uniform with a badge and a gun tended to deter people from fighting.  Sanchez
acknowledged that Del Lago had had other fights and problems and that he had
been called to the bar (or to “events” at Del Lago)[6] when arguments had broken out,
approximately every two to three months; once or twice he had to separate
people.  Officer Moriarty admitted that they had had to “separate people” before
during fights.

Finally, Smith points to
the “heated” verbal confrontations and shoving and pushing that preceded the
fight for an hour and a half as prior ongoing activity that should factor in
the duty analysis because those preceding events also made this specific fight
foreseeable to Del Lago.  Del Lago counters that Smith was required to
establish a separate and independent history of criminal activity on the
premises and that the ongoing activity that evening cannot be factored in the
foreseeability analysis.  Del Lago cites one case that directly supports its
position, but we find it to be both distinguishable and not controlling.[7]  Timberwalk itself does not exclude
the sequence of events that precede a crime from the foreseeability analysis;
rather, whether the risk is foreseeable is determined “in light of what the premises owner
knew or should have known before the criminal act occurred.”  Timberwalk,
972 S.W.2d at 757.

The gist of Smith’s case is
that Del Lago owed him a duty because of prior reported criminal and undocumented
assaultive activity (physical and verbal confrontations) at Del Lago and
because, on the occasion in question, its employees were aware (two waitresses)
or should have been aware (the bartender and security officers) of the ongoing
and escalating one-and-a-half hour confrontation, which posed an unreasonable
risk of harm.  Smith asserts that Del Lago should have taken steps to warn him or
to make the condition reasonably safe, such as by the bar staff calling
security before the fight broke out or otherwise intervening, or by a security
presence through stationing an officer in the bar or by directed patrol through
the bar.  To exclude this ongoing one-and-a-half hour activity from our
foreseeability analysis would deny the reality of the facts of this case and
distort the foreseeability analysis.[8] 
When determining whether a duty lies, we must
consider all “the facts surrounding the occurrence in question.”  Centeq Realty, Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).

Officer Chancellor opined
that it is a good idea to get intoxicated, verbally abusive people out of a bar
“because it can escalate into a fight”; he had seen it happen.  Chancellor
agreed that an hour and a half of threatening verbal confrontations between intoxicated
men was not harmless because when they are arguing, punches can be thrown.  Brandt
noted that Del Lago’s expert testified in his deposition that he would want
security called to protect his wife if she were in a bar with verbal
confrontations ongoing for an hour and a half.  A reasonable person who knew or
should have known of the one-and-a-half hours of ongoing “heated” verbal
altercations and shoving matches between intoxicated bar patrons would reasonably
foresee the potential for assaultive conduct to occur and take action to make
the condition of the premises reasonably safe.

Many of the previous incidents
at Del Lago involved alcohol; Chancellor agreed.  He referred to Del Lago as “Houston’s playground” and said it was “typical” to see guests bringing in truckloads of
alcohol through the front gate.  He said that guests brought alcohol to their
rooms and cottages in “enormous quantities,” and Sweet said that there were
intoxicated patrons in the bar every night that she worked.  Del Lago’s expert agreed
that alcohol increases the chance of some people being more aggressive, and he
conceded that alcohol probably affected behavior that night.  While Smith’s
expert opined that common factors among the reported incidents were
intoxication and violent crime, a rule that the sale of alcohol alone can
establish foreseeability of violent crime would not comport with Timberwalk;
the mere selling of alcohol does not make criminal violence against a customer
foreseeable to a premises owner.  See Boggs v. Bottomless Pit Cooking Team,
25 S.W.3d 818, 822-23 (Tex. App.—Houston [14th Dist.] 2000, no pet.); Donnell
v. Spring Sports, Inc., 920 S.W.2d 378, 384 (Tex. App.—Houston [1st Dist.]
1996, writ denied).  But the combination of alcohol and intoxication with the previous
reported alleged crimes and undocumented incidents at the bar are part of the Timberwalk
analysis regarding similarity.

Analysis

The proximity factor in Timberwalk
is not in real dispute:  For a risk to be foreseeable, there must be evidence that
other crimes have occurred on the premises or in its immediate vicinity or
closely nearby.  Timberwalk, 972 S.W.2d at 757.  Implicit is that the
prior criminal activity need not have occurred at the exact location of the
plaintiff’s injury—in this case, the bar.  All fourteen of the reported alleged
crimes occurred at Del Lago, as did the numerous undocumented assaultive
altercations and incidents.  Of the fourteen reported alleged crimes, five
occurred in or just outside the bar.  Chancellor had gone to the bar more than
twenty-five times for physical and verbal confrontations.  Sanchez said the bar
had had previous fights and that he had been called there approximately every
two to three months to handle arguments.  And, the one-and-a-half hours of verbal
confrontations and shoving matches that preceded the fight in which Smith was
injured occurred in the exact location of Smith’s assault.

Regarding recency and
frequency, the fourteen reported violent crimes occurred within three years and
seven months of Smith’s injury; eleven had occurred within two years.[9]  Chancellor had more than twenty-five
calls to the bar and approximately twenty-five calls to the tower and cottages for
physical and verbal confrontations in his six years at Del Lago; that averages
to about eight incidents a year and totals around thirty for the
three-and-a-half years before Smith’s injury.  Sanchez estimated getting called
to the bar every two or three months (four to six times a year, about sixteen
times for the three-and-a-half years before Smith’s injury).  These fourteen prior
incidents of alleged violent crimes, along with the several dozen or so
undocumented incidents of assaultive conduct (physical and verbal
confrontations that warranted calls to security), satisfy the recency and
frequency factors.  See, e.g., Dickinson Arms-REO, L.P. v. Campbell, 4 S.W.3d 333, 346-47 (Tex. App.—Houston [1st Dist.] 1999, pet. denied) (11
assaults in three-and-a-half years established recency and frequency); Urena
v. Western Investments, Inc., 122 S.W.3d 249, 255 (Tex. App.—Houston [1st Dist.] 2003 (8 violent crimes over three-year period before sexual assault
established recency and frequency), rev’d on other grounds, 162 S.W.3d
547, 550 (Tex. 2005) (reversing because no evidence of cause-in-fact).  And plainly,
the one-and-a-half hours of verbal altercations and pushing that preceded the
fight augments recency in this case.

The prior crimes need not
be identical; they only must be sufficiently similar.  In this assault case,
there were fourteen prior alleged assaultive crimes, eight of which involved the
bar or intoxication.  Between Chancellor and Sanchez, in the three-and-one-half
years before the incident in question, they responded to approximately forty-five
similar undocumented altercations (physical and verbal confrontations
warranting calls to security).  This evidence satisfies the Timberwalk
similarity factor.

Publicity—notice to Del
Lago of the previous alleged crimes and similar assaultive conduct—is not in
dispute.  All of the previously documented and reported but undocumented
activity occurred at Del Lago and was known by Del Lago.

Weighing the evidence using
all the Timberwalk factors, it was foreseeable as a matter of law that an
assault might occur in Del Lago’s bar.  See Mellon, 5 S.W.3d at 656-57. 
And on the occasion in question, it was foreseeable that Smith or a similarly
situated person would be the victim of a criminal act and be harmed.  See id. 
We hold that Del Lago owed a duty to Smith because of the prior reported criminal
activity, the prior undocumented and similar criminal and security incidents
occurring primarily in the bar but also throughout the resort, and the ongoing
and escalating one-and-a-half hours of altercations in the bar leading up to
the big fight.[10] 
We overrule Del Lago’s first three issues.

Sufficiency of the Evidence

Del Lago’s fourth issue claims that the
evidence is legally or factually insufficient to support the finding that it
breached the alleged duty.  The seventh issue asserts that the evidence is
legally and factually insufficient to support the jury’s negligence finding and
51%/49% apportionment of responsibility.

In reviewing the legal sufficiency of
the evidence, we view the evidence in the light most favorable to the verdict,
crediting favorable evidence if reasonable jurors could, and disregarding
contrary evidence unless reasonable jurors could not.  City of Keller v. Wilson,
168 S.W.3d 802, 807, 822 (Tex. 2005).  There is legally insufficient evidence
or “no evidence” of a vital fact when (a) there is a complete absence of
evidence of a vital fact; (b) the court is barred by rules of law or of
evidence from giving weight to the only evidence offered to prove a vital fact;
(c) the evidence offered to prove a vital fact is no more than a mere
scintilla; or (d) the evidence conclusively establishes the opposite of the
vital fact.  Merrell Dow
Pharms., Inc. v. Havner, 953 S.W.2d 706, 711 (Tex. 1997).  More
than a scintilla of evidence exists when the evidence supporting the finding,
as a whole, “rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions.”  Id.
(quoting Burroughs Wellcome
Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995)).  If the evidence is
so weak as to do no more than create a mere surmise or suspicion of its
existence, its legal effect is that it is no evidence.  Haynes & Boone v. Bowser Bouldin,
Ltd., 896 S.W.2d 179, 183 (Tex. 1995).

When the party without the burden of
proof at trial complains of the factual sufficiency of the evidence to support
an adverse jury finding, we must consider and weigh all of the evidence, not
just the evidence that supports the verdict.  Maritime Overseas Corp. v.
Ellis, 971 S.W.2d 402, 406-07 (Tex. 1998); Checker Bag Co. v. Washington,
27 S.W.3d 625, 633 (Tex. App.—Waco 2000, pet. denied).  We will set aside the
finding only if it is so contrary to the overwhelming weight of the evidence
that the finding is clearly wrong and unjust.  Ellis, 971 S.W.2d at
407.  Reversal can occur because the finding was based on weak or insufficient
evidence or because the proponent's proof, although adequate if taken alone, is
overwhelmed by the opponent's contrary proof.  Checker Bag, 27 S.W.3d at
633.

On these issues, Del Lago points to the
following evidence:


 Smith’s
 security expert conceded that Del Lago’s security force was significant
 and appropriate in size.


 


 No one with Del Lago felt that
 more security was needed.
 Del Lago did not have a reputation
 for violence.
 No one responsible for maintaining
 order in the bar left during the altercation.
 No
 one, including Smith, his friends, the bar staff, or bar “regulars,” felt
 the need to call security.


 


 Security
 patrolled the bar on the night in question.


 


 Del
 Lago staff called security when the fight began, and security responded
 immediately.


 


 Smith injected himself into the
 fight.


According to Merlyn Moore , Del Lago’s security expert, the lack of criminal history at Del Lago
rendered security measures at Del Lago adequate.  Moore opined that Del Lago’s
security met the standard of care.  Moore did agree with Smith’s expert, Gerald
Brandt, that directed patrol (patrol directed at areas with a history of
particular problems) is preferred over routine patrol, which he called a “waste
of resources,” but he disagreed with Brandt on whether the officers were on directed
patrol that night and also with Brandt’s opinion that Del Lago should have had
a fixed-post patrol (where an officer would stay in the bar for a certain
period of time).

Brandt, Smith’s security expert,
testified that ordinary care required a security officer present in the bar. 
He opined that Del Lago’s security program was inadequate by failing to
properly train staff, by failing to deploy officers through directed patrol,
and by failing to provide posting directions to officers, thereby placing an
officer in the bar on the night in question.  Del Lago’s officers were on
routine patrol throughout the resort on the night in question; they both knew
that the bar was crowded that night and that at the time in question, it was
the only place on the resort open and serving alcohol to the public.  Also, the
bar staff should have notified security earlier when the verbal altercations
began so that security could have defused the situation.  Del Lago also should
have required a security presence during the bar’s closing, which is when the
fight occurred.  Brandt also said that Del Lago should have warned its patrons,
including Smith, that it was not supplying security for his protection.

Smith also points to the following evidence
as support for the jury’s finding of a breach of duty and negligence of Del
Lago:


 The
 bar staff did not ask the participants in the “heated” verbal altercations
 and shoving incidents to leave the bar.


 


 Del
 Lago had not changed its security policy despite prior similar crimes and
 assaultive altercations.


 


 Security
 was not called when the bar staff was having trouble getting patrons to
 leave at closing time.


 


 Various
 witnesses testified that no security officer patrolled the bar during the
 one-and-a-half hours of verbal altercations and pushing and shoving.


 

Viewing the above evidence in the light
most favorable to the jury’s verdict, it is some evidence that reasonable
jurors could credit that supports the finding, and there is contrary evidence—such
as Duncan’s contradictory version of what happened in the bar that night and
the contradictory opinion testimony of Del Lago’s expert and security officers—that
reasonable jurors could disregard.  The evidence is legally sufficient to
support the jury’s finding of a breach of duty and negligence by Del Lago.  And
considering all of the evidence, the jury’s finding is not so contrary to the
overwhelming weight of the evidence that the finding is clearly wrong and
unjust.  It is the jury’s role to resolve conflicts in the evidence, weigh the
evidence, and judge the credibility of the witnesses; we cannot substitute our
opinion for the jury’s.  See Dickinson Arms, 4 S.W.3d at 349-50.  The
jury’s apportionment of responsibility in this case reflects a fair and just
weighing of conflicting evidence and the parties’ positions.  The evidence in
this case is factually sufficient to support the jury’s finding of a breach of
duty and negligence, including whether Del
Lago knew or reasonably should have known of the danger.[11] 
See id.; Lincoln Prop. Co. v. DeShazo, 4 S.W.3d 55, 60-62
(Tex. App.—Fort Worth 1999, pet. denied); see also Eastep v. Jack-in-the-Box, Inc., 546 S.W.2d 116, 118-20 (Tex. Civ. App.—Houston
[14th Dist.] 1977, writ ref'd n.r.e.).  Because
there is legally and factually sufficient evidence that Del Lago breached its
duty and was negligent, the trial court did not err in denying Del Lago’s
motions for directed verdict, for JNOV, and for a new trial on these grounds. 
We overrule issues four and seven.

Causation

                Issues
five and six allege that there is no evidence of proximate cause.  Proximate
cause has two elements:  cause in fact and foreseeability.  Urena, 162
S.W.2d at 552 (citing Travis v. City of Mesquite, 830 S.W.2d 94, 98 (Tex. 1992)).  “These elements cannot be established by mere conjecture, guess, or
speculation.”  Id. (quoting Doe, 907 S.W.2d at 477).  The test
for cause in fact is whether the act or omission was a substantial factor in
causing the injury without which the harm would not have occurred.  Id. (citing Marathon Corp. v. Pitzner, 106 S.W.3d 724, 727 (Tex. 2003)).  If
the defendant’s negligence merely furnished a condition that made the injuries
possible, there can be no cause in fact.  Id.  Foreseeability means that
the actor, as a person of ordinary intelligence, should have anticipated the
dangers that his or her negligent act created for others.  Travis, 830
S.W.2d at 98.

An expert’s bare or conclusory opinion
on causation is insufficient to establish causation.  Volkswagen of America,
Inc. v. Ramirez, 159 S.W.3d 897, 911-12 (Tex. 2004); Price v. Ford,
104 S.W.3d 331, 333 (Tex. App.—Dallas 2003, pet. denied).  Evidence of probative value is
necessary.  Leitch v. Hornsby, 935 S.W.2d 114, 119 (Tex. 1996).  Some evidence of causation exists when the
plaintiff introduces evidence from which reasonable minds may conclude that it
is more likely than not that the event was caused by the defendant.  See
Ramirez, 159 S.W.3d at 911; Havner v. E-Z Mart Stores, Inc., 825
S.W.2d 456, 459-60 (Tex. 1992).

On cause in fact, Del Lago argues that
it is speculation that the fight and Smith’s injuries would have been prevented
by either (1) the presence of security in the bar or (2) intervention by the
bar staff (such as calling security to the scene or ejection of one or more of
those involved) when the verbal altercations first began.  Because Del Lago
asserts there is no evidence of causation, we view the evidence in the light most favorable
to the verdict, crediting favorable evidence if reasonable jurors could, and
disregarding contrary evidence unless reasonable jurors could not.  City of Keller, 168 S.W.3d
at 807, 822.

Brandt, Smith’s expert, testified that
Del Lago caused Smith’s injuries in the following ways, among others:  (1) by
the bar staff’s failing to notify security of the ongoing altercations so they
could intervene; (2) by failing to provide security in the bar; and (3) by
failing to eject the patrons involved in the conflict.  Brandt said that these
were all substantial factors resulting in Smith’s injuries, and if security had
been present during the hour and a half, or even a few minutes before the
fight, it and Smith’s injuries could have been prevented.  Other witnesses’
testimony supports Brandt’s opinions.  Sweet said that if a security officer
had been present during the verbal confrontations and at closing, the situation
would not have progressed into the fight.  Bartender Duncan said that if Sweet saw or
heard verbal confrontations that night and did not report it, she not only violated
Del Lago policy but also put “people in a situation that could have been
avoided,” and the fight “would not have occurred.”  Duncan said that uniformed
police officers can deter just about any problem they want.  And Officer
Chancellor testified that uniformed officers and a security presence prevent
fights, and he would have removed intoxicated patrons who were engaging in
threatening behavior or pushing each other.  He said that if he had known what
had been going on in the bar, he would have done all he could to resolve it.  All
of this evidence is not speculation; it is some evidence of probative value
that the lack of security and lack of intervention was a substantial factor.

Del Lago argues that the assault was
sudden and spontaneous and that a security presence would not have deterred the
fight in which Smith was assaulted; it principally relies on two cases that so hold,
but they are fact specific and too factually distinguishable.  See Jojo’s
Restaurants, Inc. v. McFadden, 117 S.W.3d 279, 281-83 (Tex. App.—Amarillo
2003, no pet.) (sudden shooting in restaurant parking lot during traffic
altercation that provoked assailant); Donnell, 920 S.W.2d at 382-85
(sudden fight during softball game where plaintiff provoked assailant).  Whether
security would have prevented a crime is necessarily determined on a
case-by-case basis.  In this case, there was substantial testimony about the
heated hour-and-a-half confrontation that preceded the fight between the two
groups in which Smith was injured; this plainly distinguishes the cases relied
on by Del Lago.  The absence of security and lack of intervention during that
time period was a cause in fact of Smith’s injuries.  There is legally
sufficient evidence of proximate cause.  See, e.g., Havner, 825 S.W.2d at
461; DeShazo, 4 S.W.3d at 62; Dickinson Arms, 4 S.W.3d at 349-50;
Eastep, 546 S.W.2d at 120.  Having made this determination, we need not
address Del Lago’s subsidiary arguments on causation.

The
trial court did not err in denying Del Lago’s motions for directed verdict, for
JNOV, and for a new trial as to proximate cause.  We overrule issues five and
six.

Charge Error

In its eighth issue, Del Lago asserts
that the trial court erroneously refused Del Lago’s tendered instruction/definition
on foreseeability, which reads:

“FORSEEABILITY” when used with regard
to the conduct of Del Lago requires that the general danger, not the exact
sequence of events that produced the harm, be foreseeable.  In order to have a
general danger, the evidence must reveal specific previous crimes on or near
the premises in order to establish forseeability.  The five factors you must
consider in order to establish forseeability are: 1) proximity, 2) recency, 3)
frequency, 4) similarity, 5) publicity.  More specifically, you should consider
whether any criminal conduct occurred at or near the property, how recently it
occurred, how often it occurred, how similar the conduct was to the conduct in
this case, and what publicity was given to the occurrences.

 

We review a trial court’s decision to
submit or refuse a particular question or instruction under an
abuse-of-discretion standard.  Texas Dep’t of Human Serv’s. v. E.B.,
802 S.W.2d 647, 649 (Tex. 1990); Byrd v. Estate of Nelms, 154 S.W.3d
149, 160 (Tex. App.—Waco 2004, pet. denied).  The trial court has broad
discretion in submitting jury questions and instructions.  Plainsman Trading
Co. v. Crews, 898 S.W.2d 786, 791 (Tex. 1995).

The trial court submitted a standard
premises liability question:

Did the negligence, if any, of those named
below proximately cause the occurrence in question?

 

With respect to the condition of the
premises, Del Lago was negligent if-

 

            a.   the condition posed an
unreasonable risk of harm, and

 

b.     
Del Lago knew or
reasonably should have known of the danger, and

 

c.  Del Lago failed to exercise
ordinary care to protect Bradley Smith from the danger, by both failing to
adequately warn Bradley Smith of the condition and failing to make that
condition reasonably safe.

 

“Ordinary Care,” when used with respect
to the conduct of Del Lago as an owner or occupier of a premises, means that
degree of care that would be used by an owner or occupier of ordinary prudence
under the same or similar circumstances.

            

Answer “Yes” or “No” for the following:

            

                        A.  DEL LAGO                      _______________

            

                        B.  BRADLEY
SMITH          _______________[12]

 

Del Lago asserts that its proposed
instruction closely tracks the supreme court’s Timberwalk test for
foreseeability.  See Timberwalk, 972 S.W.2d at 756-57.  But that
test is for the court’s threshold legal determination whether the premises
owner owed the plaintiff a duty.  See id. at 756-59.  Del Lago then argues,
without citing any authority on point, that this question erroneously asked, in
part, whether Del Lago knew or reasonably should have known of the “danger”
without defining the “danger” and without explaining the foreseeability
component of “reasonably should have known.”

Well-settled jury charge definitions
and pattern jury charges should not “be embellished with addendum.”  Lemos
v. Montez, 680 S.W.2d 798, 801 (Tex. 1984); see Ramirez v. H.E. Butt
Grocery Co., 909 S.W.2d 62, 65 (Tex. App.—Waco 1995, writ denied).  The
trial court did not abuse its discretion in refusing Del Lago’s requested jury
instruction on foreseeability.  We overrule issue eight.

Conclusion

Because the trial court did not err in
denying Del Lago’s motions
for directed verdict, for JNOV, and for a new trial on issues one through
eight, we overrule issue nine.  Having overruled
all of Del Lago’s issues, we affirm the trial court’s judgment.

 

BILL VANCE

Justice

 

Before
Chief Justice Gray,

Justice Vance, and

Justice Reyna

            (Chief
Justice Gray dissenting)

Affirmed

Opinion
delivered and filed October 11, 2006

[CV06]









   
[1]           We
refer to Appellants Del Lago Partners, Inc. and Del Lago Partners, L.P. d/b/a
Del Lago Golf Resort & Conference Center, and BMC-The Benchmark Management Co. collectively as Del Lago.





    [2]           Smith’s
opening brief referred to Sweet’s testimony about the “heated” conflict with
citations to the reporter’s record (Vol. 4, pp. 10-11).  In its reply brief,
Del Lago asserted that Smith “repeatedly misstates Sweet’s testimony—she never
said the exchanges between the men were ‘heated.’”  In his reply brief, Smith
quoted Sweet’s testimony to note that Del Lago was the party misstating Sweet’s
testimony:

Q             How long did those confrontations go
on?

A             An hour and a half, probably.

. . .

Q             Okay.  Was it heated?

A             Yes, sir.  Well - - yes.  It was
heated.  It was - - but it was words.

Q             Okay.  Heated words?

A             Yes, sir.

Q             Did it go on over a
period of an hour and a half?

A             Off and on. 
I was working all night long, so, I mean, I was in and out through the bar.  I
mean, seeing different people.  But when I would walk by people who where in
heated - - you know, throwing words back and forth to each other - - it - - it
went on throughout the night.

 





   
[3]           Around
 4:00 a.m., Smith called Del Lago security and reported a head injury; he was
bleeding down his throat and when he blew his nose, his forehead expanded like
a balloon.  Sanchez and the manager on duty went to Smith’s cottage.  They
offered to call an ambulance, but they testified Smith refused.  Smith said he
signed a medical refusal form because Sanchez told him he would be all right. 
After going to work on Monday, June 11, Smith saw a doctor and ultimately had
two surgeries to repair face and head injuries.  His injuries included:  a
depressed frontal sinus fracture requiring surgical repair; a cerebral spinal
leak requiring repair; atrophy of the temporalis muscle requiring surgical
repair and residual disfigurement; a severe deceleration injury to the frontal
lobe and subsequent brain atrophy, resulting in permanent brain damage; and
psychological disorders from the traumatic brain injury.

 





    [4]           Chancellor
explained that a security guard may have been paid by a private party to be in
the bar on Friday night, or a Del Lago officer stationed himself in the bar,
rather than patrolling in a golf cart during heavy rain.





   
[5]           Del
Lago asserts that these prior occasions of “undocumented” similar criminal
activity should not be taken into consideration under the Timberwalk
publicity factor.  We agree with Del Lago that “unreported criminal activity on
the premises is no evidence of foreseeability.”  Gibbs v. Shuttleking, Inc.,
162 S.W.3d 603, 611 (Tex. App.—El Paso 2005, pet. ref’d) (citing Timberwalk,
972 S.W.2d at 758-59).  But we disagree with Del Lago’s categorization of this
prior criminal activity as “unreported” just because it is undocumented in Del
Lago’s records.  The rationale behind the Timberwalk publicity factor of
prior criminal activity is its role in helping to determine whether a premises
owner knew or should have known of a foreseeable danger.  Timberwalk,
972 S.W.2d at 758.  “Previous similar incidents cannot make future crime
foreseeable if nobody knows or should have known that those incidents
occurred.”  Id. at 759.  In this case, there is no doubt that Del Lago
had actual notice of these prior similar incidents; evidence of their existence
came from Del Lago’s security personnel, who obviously knew of them but did not
document them.  These prior similar incidents are properly included in our Timberwalk
foreseeability analysis:  “Actual notice of past incidents strengthens the
claim that future crime was foreseeable.”  Id. at 758.

 





    [6]           Sanchez’s
testimony is not clear on whether he was called to the bar to assist
when people were arguing or to “events” elsewhere at Del Lago.  Because the
questions preceding the use of the term “event” were about the bar, the first
question using the term “event” referred to the bar, and the key event in this
case concerned the bar, it can reasonably be inferred that Smith’s attorney and
Sanchez were referring to events in the bar:

Q             By - - by
the way, there has been - - have you been in the bar when they have
closed The Grandstand bar?

A             Yes, sir.

Q             Have you participated in
helping them close?

A             Yes, sir.

Q             Why would you do that?

A             Someone from
the bar would call our dispatcher and say they were getting ready to close, and
there were some people that were - - or some guests that were just not ready to
leave; they wanted to finish their drinks.

Q             And what would you do?

A             Just go in
and ask them if they wouldn’t mind putting their drinks away; it was time for
them to close the bar.

Q             Do you ever
remember an event where the bartenders were asking other patrons to help
them get people to leave?

A             No, sir.

Q             That would be
inappropriate, wouldn’t it?  Would it not?

A             To me, it would be.

Q             Have you
ever had an event where people got into an argument where you were
called in to help out?

A             Yes, sir.

Q             How often does that
happen?

A             Maybe once every two,
three months.

[Emphasis added].

 





    [7]           In
De Julian v. Hammock, 2003 WL 22004947 (Tex. App.—Texarkana Aug. 26, 2003, no pet.) (mem. op.), an apartment complex resident was
shot in the eye with a BB gun by the complex owner’s nephew, but there was no
evidence the owner had knowledge of any recent assaultive conduct by the
nephew.  After the appellate court affirmed summary judgment for the owner, the
resident urged in his motion for rehearing that the owner should have heard his
nephew’s hour-and-a-half BB gun shooting spree throughout the complex and that
the owner should have taken action to prevent harm.  The court rejected the
assertion that this episode alone created a duty:  “We do not believe the same
series of events that led to [the resident’s] injury can be used to provide
notice to [the owner] of ‘previous’ crimes and thereby raise an issue of
foreseeability of this injury.”  Id. at *4 (op. on reh’g).  As Smith
notes, there was no evidence the owner knew—or had notice—that his nephew was
roaming the complex shooting at people; there was only the injured resident’s
allegation that the owner should have heard the events and taken action.  See
id.  That aspect, and the owner’s lack of knowledge of recent assaultive
conduct by the nephew, render De Julian factually inapposite to the
issue before us.

Other cases cited by Del Lago on this are
likewise factually distinguishable:  Dailey v. Albertson’s, Inc., 83
S.W.3d 222, 228 (Tex. App.—El Paso 2002, no pet.) (where store employee
assaulted customer with box cutter, store could not foresee employee’s violence
based only on “verbal abuse”—one loud comment directed at customer and a later
brief exchange of words, with no other evidence of criminal activity); Gonzales
v. Mobil Oil Corp., 2001 WL 722564, at *4-5 (Tex. App.—Dallas June 28,
2001, no pet.) (finding no duty to warn gas station customer who was shot based
on shooter’s “suspicious and unusual” conduct, which alone do not create a
reasonable belief that a person has a likely propensity to commit violent
criminal acts); Yarbrough v. Erway, 705 S.W.2d 198, 200-04 (Tex.
App.—Houston [14th Dist.] 1986, writ ref’d n.r.e.) (where bar patrons bumped
each other twice and then went outside, where one stabbed the other, there was
no evidence of probative value that put bar employees on notice that a
dangerous or threatening situation existed between the two patrons).





    [8]           Pre-Timberwalk case law supports
our inclusion of the ongoing activity and is not inconsistent with Timberwalk. 
See, e.g., Polk v. Rhinstone Wrangler & K.C.O., Inc., 774 S.W.2d
799, 801 (Tex. App.—Texarkana 1989, no writ) (in finding duty, in addition to club’s
prior history of fights, court considered that, on the night of the assault in
question, a fight had broken out an hour before and security was not called,
and the same persons fighting injured the plaintiff); Ronk v. Parking
Concepts of Tex., Inc., 711 S.W.2d 409, 412 (Tex. App.—Fort Worth 1986, no
writ) (“The proprietor of the public business establishment has the duty to
exercise reasonable care to protect his patrons from intentional injuries
caused by third persons if he has reason to know that such acts are
likely to occur, either generally or at some particular time.”)
(emphasis added) (quoting Walkoviak v. Hilton Hotels Corp., 580 S.W.2d
623, 625 (Tex. Civ. App.—Houston [14th Dist.] 1979, writ ref’d n.r.e.));
Eastep v. Jack-in-the-Box, Inc., 546
S.W.2d 116, 119-20 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ ref’d
n.r.e.) (“The portion of the rule requiring notice to the possessor that
acts of violence are likely to be done does not require a long and continued
course of conduct to find that the proprietor had knowledge of the violent
disposition of the other patron—all that is necessary is that there be a
sequence of conduct sufficiently long to enable the proprietor to act for the
patron's safety.”) (emphasis added).





    [9]           Del
Lago’s expert found most of these crimes dissimilar to the assault on Smith
because they were of an inter-personal or domestic nature, rather than
stranger-initiated.  This position was not followed—correctly, we believe—in Dickinson
Arms.  See Dickinson Arms-REO, L.P. v. Campbell, 4 S.W.3d 333,
347-49 (Tex. App.—Houston [1st Dist.] 1999, pet. denied).





    [10]         If
we were to exclude the ongoing activity from our foreseeability analysis, we
would still conclude that Del Lago owed Smith a duty based on the prior
documented crimes and the undocumented similar incidents.





    [11]         In
finding that the evidence satisfied the Timberwalk factors to establish
foreseeability and a duty, we necessarily found the evidence legally sufficient
to support the jury’s finding that Del Lago knew or reasonably should have
known of the danger.  For the reasons explained in our duty discussion, that
evidence is also factually sufficient to support that finding.





    [12]         The
question properly tracks the pattern jury charge question for an invitee in a
premises liability case.  See Comm.
on Pattern Jury Charges, State Bar of Tex., Texas Pattern Jury Charges,
PJC 66.4 (2003).